IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BERNARD BARKSDALE, JR. AND ELIJAH SEFA, | |
| Plaintiffs, | Case No. 25-cv-13368 |
| v. | *Jury Trial Demanded.* |
| MARIO FUENTES, NICU TOHATAN, AND CITY OF CHICAGO, | |
| Defendants. | |

## COMPLAINT

NOW COME Plaintiffs BERNARD BARKSDALE, JR. and ELIJAH SEFA, by their attorney, LAW OFFICE OF JORDAN MARSH LLC, and complaining of the Defendants, MARIO FUENTES, NICU TOHATAN, and CITY OF CHICAGO, and state the following:

### JURISDICTION AND VENUE

1. This action arises under the Constitution of the United States, particularly the Fourth Amendment to the Constitution of the United States, under the laws of the United States, particularly the Civil Rights Act, Title 42 of the United States Code, Sections 1983 and 1988, and under the laws of the State of Illinois.

2. The jurisdiction of this Court is invoked under the provisions of Title 28 of the United States Code, 1331 and 1343. Plaintiff also invokes the supplemental jurisdiction of this Court pursuant to Title 28 of the United States Code, Section 1367.

1

3. This Court has jurisdiction over this action pursuant to Title 28 of the United States Code §§ 1331 and 1367, as Plaintiff asserts claims under federal law and the state law claims arise out of the same facts as the Federal claims. Venue is proper under Title 28 of the United States Code, § 1391(b)(2), as the events complained of occurred within this district.

## PARTIES

4. At all times relevant herein, Plaintiffs BERNARD BARKSDALE, JR. ("Bernard") and ELIJAH SEFA ("Elijah") were residents of the County of Cook, State of Illinois.

5. Defendants FUENTES and TOHATAN ("Defendant Officers") are sued in their individual capacities and were at all times relevant, sworn tactical police officers employed by Defendant CITY OF CHICAGO, and were acting within the scope of their agency, service and/or employment with the CITY OF CHICAGO, and were acting under color of the statutes, ordinances, regulations, customs, and usages of the State of Illinois.

6. Defendant, CITY OF CHICAGO, is a government entity operating within the State of Illinois. The CITY OF CHICAGO is responsible for the actions of its employees while acting within the scope of their employment. At all times relevant to this action, CITY OF CHICAGO was the employer of Defendants FUENTES and TOHATAN.

## FACTUAL ALLEGATIONS

7. On February 16, 2025, at approximately 6:33 p.m., Bernard was in the driver's seat of his brother Elijah's car, at or near 401 N. Michigan Avenue in Chicago, looking at his phone, when defendant officers approached the vehicle.

8. The officers stated that the vehicle was parked in a tow zone, and Bernard said that he was waiting for his brother, who was in the Apple store.

2

9. Defendant Tohatan asked Bernard if the car was his, and Bernard responded that it was his brother's car.

10. Tohatan asked if Bernard had his license and insurance on him.

11. Bernard handed his license and the vehicle insurance card to Tohatan.

12. Tohatan briefly glanced at the items, handed them back to Bernard, and stated, "We're asking everybody on stops, do you have an F-O-I-D card?"

13. Bernard denied having a FOID card.

14. Tohatan asked Bernard, "You said it's your brother's car?" Bernard responded, "Yeah."

15. Tohatan then asked Bernard, "Any weapons in the vehicle right now?" Bernard responded, "I don't think so."

16. At no point did Bernard make any furtive movements or exhibit signs of nervousness.

17. Tohatan asked Bernard if his brother had a FOID card, and Bernard said that he did, while maintaining direct eye contact with Tohatan.

18. After a few seconds, Tohatan asked, "Is there a weapon in that backpack over there?" in reference to a backpack in the passenger seat. For the first time during the traffic stop, Bernard glanced at the backpack and responded, "No, I don't think so."

19. Tohatan ordered Bernard out the car, and he complied.

20. Tohatan asked Bernard if he had anything on him.

21. Bernard denied having anything on him, and Tohatan patted Bernard down despite having no reason to believe Bernard was armed or dangerous.

22. At this point, the officers had no reasonable suspicion or probable cause to believe Bernard had committed any crime.

23. Tohatan walked Bernard to an unmarked police vehicle where Defendant Fuentes was sitting and asked Fuentes to watch Bernard for a second. Fuentes exited the vehicle to watch Bernard.

24. Tohatan returned to Elijah's car, grabbed, and searched the backpack. Finding nothing, Tohatan then searched the center console and found a gun.

25. The gun belonged to and was registered to Bernard's brother Elijah, who possessed a FOID card and a Concealed Carry License.

26. Bernard did not know the gun was in the car.

27. Tohatan walked over to Fuentes and Bernard and told Bernard to put his arms behind his back.

28. Fuentes handcuffed Bernard's hands behind his back while Tohatan held Bernard from the front.

29. Tohatan asked Bernard who the gun belonged to, and Bernard responded, "I just told you that's my brother's car."

30. Tohatan returned to the car, grabbed the gun, and emptied the chamber.

31. Tohatan asked Bernard, "How about you? Do you have a FOID card?" Bernard responded, "No." Tohatan asked, "Then what are you doing next to the gun?"

32. Bernard continued to explain it was not his car and that he did not know the gun was in the car or when his brother put the gun in the car.

33. The officers told Bernard they would figure things out at the station.

4

34. Bernard asked Tohatan and Fuentes to get his brother and if he could call his brother. Fuentes told him, "That's not how it works, though."

35. Tohatan felt around the outside of both of Bernard's front pockets, then asked Bernard why his FOID card was revoked. Bernard reaffirmed that he did not have a FOID card and said that he's never been to jail.

36. Fuentes returned to his police vehicle to "double check" if Bernard's FOID card was revoked.

37. Bernard tried to reach for his cell phone to record the interaction between him and the officers, and Tohatan told him not to reach in his pockets because he was being detained. Bernard asked, "For what?"

38. Fuentes exited the police vehicle and said that Bernard was an ineligible minor for a FOID card and asked him if he was ever arrested. Bernard denied ever being arrested.

39. Bernard restated that his brother was in the store and everything in the car was his brother's.

40. Tohatan told Bernard he wasn't listening and kept reaching in his pockets. Bernard said it was his right to record, and Tohatan said, "No, it's not your right; your right is to be quiet because you're under arrest."

41. Again, Bernard asked why he was being arrested and said he told the officers that his brother was in the store. Fuentes responded, "I know anyone can say that, though. Where's your brother?"

42. At that point, Tohatan escorted Bernard to a squad car.

43. Fuentes returned to the unmarked police vehicle and said, "Partner, you got keys? Let's go. Too cold out here for this."

44. The officers arrested Bernard, and he was transported to the 18th District for processing. He was ultimately charged with Aggravated Unlawful Possession of a Weapon, a Class 4 Felony punishable by up to three years in prison.

45. In Bernard's arrest report, Defendant Tohatan attested under penalty of perjury that the officers "observed the driver to be nervous and looking towards the backpack. [Arresting officers] then asked if there are any firearms in the backpack at which the driver replied 'i don't know' while losing eye contact with [arresting officer]."

46. This was false.

47. On April 29, 2025, Defendant Fuentes testified under oath at a preliminary hearing in the case against Bernard.

48. Fuentes testified at the preliminary hearing that Bernard "was nervous", that "[h]e kept looking to his right side", and that "[h]e was shaking." Fuentes further testified that the center console was the same area in which he observed Bernard making motions towards.

49. This testimony was false.

50. Bernard did not lean towards the right side of the vehicle during the incident except to return the auto insurance documents to the glove compartment.

51. Bernard did not exhibit signs of nervousness during the incident.

52. Bernard did not keep looking to his right side during the incident.

53. Bernard was not shaking during the incident.

54. Bernard did not make motions toward the center console area.

6

55. Bernard repeatedly told officers that the gun was not his.

56. Based on Fuentes' perjured testimony, the judge found probable cause for the Aggravated Unlawful Possession of a Weapon charge, allowing the case against Bernard to move forward.

57. On August 14, 2025, Bernard's attorney filed a motion to suppress based on the illegal stop and search of the car.

58. On September 22, 2025, before the motion to suppress was briefed or ruled on, the State dismissed the case via *Nolle Prosequi*.

59. By submitting knowingly false and perjured testimony, Fuentes unlawfully lied to and manipulated a Cook County judge and corrupted a judicial proceeding, leading to a false probable cause finding which extended the case against Bernard.

60. On information and belief, Fuentes lied to the Assistant State's Attorney prior to his testimony regarding Bernard's actions on the date in question.

61. As a result of the officers' unlawful conduct and false reports and Fuentes' perjured testimony, Bernard was forced to endure months of fear and anxiety, and the threat of felony prosecution and years in prison.

62. Defendant officers unlawfully confiscated Elijah's firearm, which he has not yet received back.

63. Defendant officers unlawfully confiscated Elijah's vehicle.

## DEFENDANT OFFICERS' HISTORY OF MISCONDUCT

64. Since this incident, Defendants Tohatan and Fuentes have been relieved of their police powers due to multiple investigations into serious allegations of police misconduct.

7

65. Defendants Tohatan and Fuentes already have extensive histories of sustained allegations of misconduct.

66. Defendants Tohatan and Fuentes were members of the 1863 tactical team, which has been the subject of numerous investigations by the Civilian Office of Police Accountability ("COPA").

67. In December 2024, COPA identified patterns of concern involving Defendants Tohatan and Fuentes and the 1863 tactical team. These included "unprofessional and disrespectful conduct towards civilians, including the use of profanities, insults, and threats of force"; the use of pretextual traffic stops for reasons such as stopping too far away from the curb, stopping in a non-parking zone, and seatbelt violations"; and "a consistent failure to adhere to CPD policies regarding the documentation and recording of civilian/police encounters, including to complete ISRs and TSSS cards, failing to provide ISR receipts, and late BWC activations."

68. In October 2025, COPA issued memoranda regarding certain 1863 tactical members, noting that Defendant Tohatan had the third-highest number of complaints–also known as log numbers–in the Chicago Police Department (46 log numbers) and that Defendant Fuentes had the fourth-highest number of complaints (43 log numbers).

69. The average Chicago Police Department member has 3.5 log numbers.

70. COPA further noted that the majority of the complaints and investigations involve allegations of unjustified traffic stops, arrests, searches, and disrespectful or unprofessional conduct.

## **LAWSUITS AGAINST DEFENDANT OFFICERS**

71. Defendant Officers are no strangers to being accused of unlawful conduct similar to the conduct described in this complaint.

72. In *Haley v. Tohatan, et al.* (22-cv-1785), Defendant Tohatan was accused of unlawful search and seizure after he and another officer approached a stopped vehicle on West Erie Street on December 8, 2021.

73. The plaintiff in Haley alleged that Tohatan ordered him out of his car, handcuffed him, and searched his car despite there being no probable cause or reasonable suspicion of any criminal conduct.

74. The City settled *Haley* for $38,000.

75. In *Partee v. Hasan* (2019-cv-3689), Defendant Tohatan and two other officers were accused of handcuffing the plaintiff and searching his car despite the fact that the plaintiff had done nothing illegal.

76. The City settled *Partee* for $40,000.

77. In *Farris v. City of Chicago et al.* (22-cv-1729), Defendants Tohatan and Fuentes were accused of excessive force, unlawful search, wrongful detention, and malicious prosecution after they approached a stopped vehicle.

78. The City settled *Farris* for $100,000.

79. In *Northington v. Tohatan* (24-cv-11466), Defendants Tohatan and Fuentes were accused of approaching the plaintiff's stopped car for a minor parking violation, pulling him out of his car, handcuffing, and detaining him, searching his car, mocking, insulting, and threatening him before walking away and authoring a falsified stop report.

9

80. The City settled *Northington* for $80,000.

81. In *Ipaye v. City of Chicago et al.* (24-cv-8958), Defendant Tohatan was accused of approaching the plaintiff as he was putting air in his tires of a car and unlawfully seizing the plaintiff and searching his bag.

82. The City settled *Ipaye* for $80,000.

83. In *Garcia v. Vecchio et al.* (25-cv-13109), Defendants Tohatan and Fuentes are accused of unlawfully searching the plaintiff without reasonable suspicion or probable cause.

84. The *Garcia* lawsuit remains pending.

85. The cases cited above are just the tip of the iceberg when it comes to lawsuits against Chicago police for unlawful stops and searches.

86. The city has paid millions of dollars in settlements of lawsuits alleging unlawful traffic and investigatory stops and illegal searches.

87. As just one example, the City's Law Department recently agreed to pay the family of Dexter Reed $1.25 million to settle their lawsuit arising from an illegal, pretextual stop of Reed by Chicago police which resulted in the death of Reed and the wounding of an officer.

## DEFENDANT FUENTES' DISCIPLINARY HISTORY

88. Defendant Fuentes has been disciplined for similar conduct in the past.

89. On May 30, 2023, COPA sustained allegations against Defendant Fuentes and another officer of using profanity against a civilian at a traffic stop, unlawfully detaining the civilian, and unlawfully impounding the civilian's vehicle.

90. During the incident, Fuentes ordered the driver out of the car and handcuffed him, telling him his car would be towed. Fuentes yelled at the man, "Your $50,000 car is my car now! No, no, it's my car now! It's my car now! My car now! My car!"

91. Fuentes later claimed he searched the car because he smelled burnt cannabis. But the search yielded no narcotics or other contraband.

92. The officers issued the civilian a citation for parking in a tow zone, and ordered his car towed under a provision of the City of Chicago ordinances that authorized towing "[w]hen an unattended vehicle is parked illegally" in a marked tow zone.

93. The civilian was found "not liable" by the administrative law judge on his citation – presumably because his car was not unattended.

94. COPA recommended that Fuentes receive a 45-day suspension for his conduct.

95. The Chicago Police Department concurred with COPA's findings but felt Defendant Fuentes should receive only a 10-day suspension.

96. On January 16, 2024, COPA sustained allegations that Defendant Fuentes "made insulting, mocking and belittling statements" toward two civilians at a traffic stop, and that he arrested a civilian and impounded his vehicle as retaliation for the civilian looking at Fuentes' identification.

97. At several points during the stop, Fuentes told the civilians that they were "ignorant as fuck" and commented to a fellow officer that one of the civilians was a "jag," which Fuentes later admitted was shorthand for "jagoff."

98. When Fuentes observed the civilian looking at his star number and squad car, Fuentes said, "You are not going to size me up like that, looking at my star number and my vehicle number."

99. The COPA investigator noted in his report that "[d]espite Fuentes claiming in his interview that he felt [one of the civilians] was disrespectful and did not respect their authority, only Fuentes is captured acting in a disrespectful manner."

100. COPA recommended a 10-day suspension for Fuentes as a result of his conduct.

101. On January 23, 2024, COPA sustained allegations that Defendant Fuentes and another officer used profanity and racist language toward African-American civilians during a traffic stop.

102. During the traffic stop, Fuentes told another officer, "I'm tired of these fucking people acting like animals, dude," and referred to the civilians as "fucking animals."

103. Fuentes' conduct was captured on body-worn camera footage.

104. COPA recommended a suspension of up to 30 days for Fuentes.

105. On April 5, 2024, the Chicago Police Department concurred with COPA's findings and its recommended penalty of a 30-day suspension for Defendant Fuentes.

**DEFENDANT TOHATANS' DISCPLINARY HISTORY**

106. On November 27, 2018, COPA sustained allegations that Defendant Tohatan engaged in an unjustified verbal altercation with a civilian, illegally searched the civilian's car, and improperly issued a citation to the civilian for no proof of insurance despite the civilian offering to show him proof of insurance on his phone.

107. The incident began when Tohatan and another officer pulled the civilian over after doing a U-turn.

108. COPA recommended a 7-day suspension for Defendant Tohatan.

109. On August 25, 2020, COPA sustained an allegation that Defendant Tohatan engaged in verbal abuse.

110. Tohatan was suspended for 5 days as a result of his misconduct.

111. On December 20, 2022, COPA sustained allegations that Defendant Tohatan engaged in verbal abuse and profanity.

112. Defendant Tohatan was suspended for 5 days as a result of his misconduct.

113. On April 11, 2023, COPA sustained allegations that Defendant Tohatan engaged in an undisclosed civil rights violation.

114. Tohatan was reprimanded for his misconduct.

115. On December 14, 2023, COPA sustained allegations that Defendant Tohatan engaged in undisclosed misconduct during a traffic stop.

116. On an unknown date, COPA sustained allegations against Defendant Tohatan of Coercion Threat of Arrest/Charges Coerced Confession.

117. The discipline cited above is just the tip of the iceberg when it comes to discipline against Chicago police officer for unlawful stops and searches and verbal abuse of civilians.

118. As a result of the foregoing, Bernard and Elijah were deprived of rights secured by the Fourth Amendment to the United States Constitution, as well as Illinois law.

## PRAYER FOR RELIEF

For the foregoing reasons, the Plaintiffs BERNARD BARKSDALE, JR. and ELIJAH SEFA, pray for judgment against Defendants in a fair and reasonable amount, including compensatory and punitive damages, attorney fees and costs, and for any additional relief this Court deems just and proper.

## JURY DEMAND

The Plaintiffs BERNARD BARKSDALE, JR. and ELIJAH SEFA request a trial by jury.

**DATED:** October 31, 2025.

                                              Respectfully submitted,
                                              BERNARD BARKSDALE, JR. AND ELIJAH SEFA

                                              /s/ Jordan Marsh
                                              *Attorney for the Plaintiffs*

**LAW OFFICE OF JORDAN MARSH LLC**
33 North LaSalle Street Suite 2000
Chicago, IL 60602
(224) 220-9000
jordan@jmarshlaw.com